THE MORRIS AND ESSEX RAILROAD COMPANY, appellants, and THE SUSSEX RAILROAD COMPANY, respondents.

1. Corporations are presumed to contract within the existing powers of their charters; and where general words are used in a contract between them admitting of a double construction, they must be construed consistently with the scope and powers of the charter.

2. The words, "any *future extensions or branches*," in a contract between two connecting railroad corporations for a division or drawback of freights and fares over their roads, "or any future extensions or branches of the same," must not be construed, in their general sense, to apply to extensions then unauthorized by the legislature, where there were unexhausted powers in the charter and supplements, at the time of the contract, to build other extensions or branches, sufficient to meet the requirements of the words.

3. The third section of the act of 1846, concerning corporations, (*Nix. Dig.* 168,) providing, that in addition to the powers enumerated in the first section of the act, (which are the ordinary powers of all corporations,) "and to those expressly given in its charter or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the

powers so enumerated and given," must be taken as a prohibition of any acts not within the scope of the powers permitted, and contracts in contravention of it are illegal. *Held*—that it was not within the scope of the charter and supplements of the Morris and Essex Railroad Company, to make a contract with the Sussex Railroad Company for rates of freight and fare over extensions not authorized at the time of the contract, and that such a contract, if intended to include extensions afterwards authorized and built, was illegal, and could not be enforced as to them, (there being, in this case, no ratification by the legislature or by authority of the corporation after the extensions were authorized).

*Quare.* Whether the common law rule does not come up to the extent of the statute ? BEDLE, J.

4. The right of railroad corporations to divide through fares and freights on authorized lines, or to offer inducements by a reduction in rates to secure freights and travel over such lines, are contracts concerning their own authorized business, and not objectionable unless unconscionable.

5. Extensions afterwards authorized and built, will not be substituted for other extensions and modes of transportation authorized at the time of the contract, without an intention to that effect in the contract, even if no question of power to contract concerning them interfered.

[The contracts of promoters of railroads in England considered; and not analogous to this case.]

The following is a copy of such parts of the contract, upon which the bill was filed, as are involved in this appeal :

" Articles of agreement made this 24th day of July, in the year of our Lord 1852, between the Morris and Essex Railroad Company of the first part, and the Sussex Mine Railroad Company of the second part :

" WHEREAS, the said Morris and Essex Railroad Company is now engaged in extending the railroad of the said company from the village of Dover to the village of Hackettstown, and the said the Sussex Mine Railroad Company is about to reconstruct the railroad of the said company between the village of Waterloo and the village of Andover, in the county of Sussex, and to connect the same with the railroad of the said Morris and Essex Railroad Company at some point intermediate between the villages of Stanhope and Waterloo, or at or near one of the said villages, and to extend the said railroad from Andover to the village of Newton, in the said county of Sussex ; *and whereas,* the

said parties, for their mutual accommodation and benefit, have, and by these presents do, enter into the following articles of agreement, that is to say:

"*First*. It is understood and agreed that all freight and passengers which shall be transported over either of the roads of the said companies, or any future extensions or branches of the same, to the said point of intersection, and destined for any towns or places at the termini or on the line of the said roads, respectively, or any future extensions or branches of the same, shall be forwarded by said respective companies to the town or places of their destination with all convenient despatch, and by the ordinary means of transporting freight and passengers upon said respective roads, and at prices not exceeding the average rates charged per mile at the time by said companies, respectively, for other freight and passengers of the same class, to and from other places on the line of the said roads, respectively; and the said Morris and Essex Railroad Company agree to stop their trains at the said point of intersection to receive the freight and passengers, which may be brought to the said point of intersection, over the said Sussex Mine Railroad, in the trains of the said Sussex Mine Railroad Company, run to meet and connect with the trains of the said Morris and Essex Railroad Company, and to discharge freight and passengers intended for the same.

"*Second*. That the rates of transportation of all freight and passengers passing upon both of said roads shall be mutually agreed upon by said companies, and in case they fail to agree as to said rates, then that each company shall and may fix the said rates upon their respective roads; but it is hereby expressly agreed that neither of the said companies shall fix or adopt any higher rate of transportation upon freight and passengers to and from the said point of intersection, than the average rate per mile adopted by the said company between other points and places upon the line of the road of said company, for the same classes of freight and passengers; nor shall either of the said companies, in any

wise, so arrange its tariff of charges on freight and passengers as to discriminate against the freight or passengers which may be offered for transportation by the other company.

"*Third.* That the settlement between the said companies shall be made monthly, and that the said Morris and Essex Railroad Company shall allow and pay to the said Sussex Mine Railroad Company, in addition to the regular receipts of the said Sussex Mine Railroad Company, according to the provisions of the foregoing articles, thirty per cent. of the gross amount of the receipts of the said Morris and Essex Railroad Company, for the transportation of all passengers passing on the roads of both of said companies, and twenty-five per cent. of the gross amount of the receipts of said company for the transportation of all freight passing on the roads of both of said companies, and also the same per centage on all deductions which shall be made to the said Morris and Essex Railroad Company, for the said freight or passengers by any other railroad company, from the ordinary charges of such other company over whose railroad the said passengers and freight may be transported. The said allowance and payment is not, however, to be made on any passengers or freight which shall pass over said Sussex Mine Railroad, for any distance less than two miles."

The case will be found fully stated in 4 *C. E. Green* 13. From a decree in accordance with the opinion of the Chancellor there reported, the defendants appealed.

*Mr. Vanatta,* for appellants.

The question as to liability of Morris and Essex road depends on two questions: 1. Whether original contract as to that per centage is a legal and binding contract? If not, of course, it can have no application to extensions and branches. 2. Whether or no it applies to extensions made under authority acquired after making the contract?

2 z*

1. As to legality and validity of contract itself. I mean that portion of contract which requires payment of defendants' earnings to. complainant.

It is desirable to look closely, ascertain accurately, whence this per centage is to be derived, who is to pay it, and .for what it is to be paid.

It is to be observed that the Sussex road is to have the whole of its own earnings, and, in addition, these respective per centages of the earnings of the Morris and Essex road. There is no agreement to carry for the Sussex road at a cheaper rate. No such agreement was desired by the Sussex road. The more there was charged the greater was the per centage received by them. The contract does not provide for any division of the profits of the Sussex road. The Chancellor goes upon the idea that there was a contract to divide profits—a sort of partnership. The Morris and Essex road are to have no part or share at all in the earnings of the Sussex road. There is to be no division of the joint profits, but a division of the profits of the stockholders of the Morris and Essex road with aliens.

Then, what is the consideration for the surrender of the earnings of this road ? What is the *quid pro quo ?* In return for what, are the Morris and Essex road to pay thirty per cent. of the freight earnings and twenty-five per cent. of the passenger ? The seal of the company is not sufficient consideration. There must be a valuable consideration, and a *lawful* one. Why the consideration of this contract to give such per centage of the earnings of the Morris and Essex road, was the building of the road from Andover to Newton ?'

A court of equity will look at the primary, moving, controlling consideration, without which the contract would not have been made. *Shrewsbury* v. *The North Staffordshire Railway Co.,* 1 *Eq. Cas.* (*Law Rep.*) 593.

This payment, then, was a reward and compensation to the complainants, for extending their road to Newton.

There are many instances where railroads connecting with each other share their profits, but not where a railroad.

agrees to pay another a per centage of its profits for constructing a railroad.

Why the consideration was the building of the road to Newton, which would cost $450,000; that is, it was a mortgage on the Morris and Essex road for $450,000; and if the road to Newton was not finished by the time specified in the contract, these appellants (the defendants below) would not have been required to pay this per centage. This is the view of both the learned counsel on the other side, and of the Chancellor, entirely agreeing with my own.

A private corporation may do what its charter expressly authorizes it to do, and what is necessary to accomplish what it is expressly authorized to do. Strict construction of this doctrine is established in this state. *State* v. *City of Elizabeth,* 4 *Dutcher* 103; *State* v. *City of Newark,* 2 *Dutcher* 519; *Trenton Mutual Life Ins. Co.* v. *McKelway,* 1 *Beas.* 133.

Now the fact is, that the Morris and Essex road are here contracting to construct a road which they were not authorized to construct, and which consequently was not within their power. This doctrine is strikingly enforced in the late case of *Rar. & Del. Bay R. Co.* v. *C. & A. R. Co.,* 3 *C. E. Green* 567; see, also, *Pearce* v. *Madison and Indianapolis R. Co.,* 21 *How.* 441; *Russell* v. *Topping,* 5 *McLean* 194; *Abbott* v. *Baltimore Steam Packet Co.,* 1 *Maryland C. R.* 542. In this latter case it was also held that the corporation may itself, upon an action upon such a contract, deny its power to enter into it. See also, *Steam Navigation Co.* v. *Dandridge,* 8 *Gill & Johns.* 248; *Mutual Savings Bank* v. *Meriden Agency,* 24 *Conn.* 159; *Berry* v. *Yates,* 24 *Barb.* 199; *Talmadge* v. *Pell,* 3 *Seld.* 328.

By the original charter of the Morris and Essex road, 11th section, after defraying expenses of the road, the funds are to be divided among their stockholders, and not to be given to somebody in Sussex county to build a road.

A railroad company cannot, even with the assent of all its stockholders, use the funds for an object foreign to that of its incorporation. *East Anglian R. Co.* v. *Eastern Coun-*

ties *R. Co.*, 11 *Com. Bench* 775. Similar cases : *McGregor* v. *Dover and Deal R. Co.*, 18 *Ad. & Ellis*, (*N. S.*) 618. More strict construction yet, is, *Bostock* v. *North Stafford-shire R. Co.*, 4 *Ellis & Bl.* 798; *Norwich* v. *Norfolk R. Co.*, *Ibid.* 397, 441.

Although the agreement should be itself all right, yet we have the right to look below, on the question of *ultra vires*. *Royal British Bank* v. *Turquand*, 5 *Ellis & Bl.* 248. This was an action on a bond made by corporation.

The case of *Shrewsbury and Birmingham R. Co.* v. *London and N. W. R. Co.*, 17 *Ad. & Ellis* (*N. S.*) 652, seems to have been considered by the Chancellor as one similar to this. The agreement in that case was very different from this; it was an agreement for working several lines of railways in connection, proceeds to be divided among them, proportionally to the lengths of the several roads, respectively.

Here there is no proportion. The Sussex company keep all they have got, and try to get out of us all they can.

I go now to the English cases in equity. Apparently the leading case is *Colman* v. *East. Co. R. Co.*, 10 *Beav.* 1. See, also, *Attorney-General* v. *Norwich*, 16 *Sim.* 225.

Expected benefits will not justify the use of the funds of a corporation in an unauthorized manner. *Mount* v. *Shrewsbury and Chester R. Co.*, 13 *Beav.* 1; *S. C.*, 3 *Eng. L. & Eq.* 144; *Salomons* v. *Laing*, 12 *Beav.* 339; see on *p.* 352, what the Master of the Rolls said as to any application or dealing with the capital, or the funds of the corporation in any way not authorized by the charter. *Simpson* v. *Denison*, 10 *Hare* 51; *S. C.*, 13 *Eng. L. & Eq.* 359. In this latter case, I take the distinction to be as to whether the object of the contract is simply to divide the tolls of the companies between them, or whether it is to supply funds for the purpose of constructing another work.

*Bagshaw* v. *The Eastern Union R. Co.*, 2 *McN. & G.* 389; *Eastern Counties R.* v. *Hawkes*, 5 *H. L. Cases* 345–8; 21 *Eng. L. & Eq.* 321; 16 *Beav.* 441.

This contract is one not fit to be enforced in equity, because it is unequal, unconscionable, against public policy.

So long as it is profitable to the Sussex Company and unprofitable to the Morris and Essex Railroad Company, all very good, but so soon as it is unprofitable to the Sussex road, they may stop bringing passengers and freight to the point of intersection. There is no mutuality; nothing reciprocal; so long as they can burden us, very good. Why reciprocity is the very essence of a contract.

They are here really for specific performance, to get accounts, manifests, way-bills, and such divers papers. Why did they not bring an action of covenant for the amounts due on the contract? Then, too, they could get damages. Why then are they here in a court of equity? For specific performance. To compel us to do what the law could not compel us to do.

See *Taylor* v. *Chichester and Midland R. Co.*, 2 *Exch.* (*Law Rep.*) 366; *Eastern Counties R. Co.* v. *Hawkes*, 5 *H. L. Cases* 331.

A railway company cannot give away its earnings. *Gage* v. *New Market R. Co.*, 18 *Ad. & Ellis* (*N. S.*) 457.

Even upon the law of partnership, I take it this contract would be held to be illegal, would be void as against a stockholder of the Morris and Essex Railroad Company. It could not be made without his consent.

How could the Morris and Essex Railroad Company bind the property of their company, as to things not possible to be contemplated? 2 *Eq. Cas.* (*Law Rep.*) 524.

But even if this contract was valid, can it be possible that the Morris and Essex Railroad Company intended this contract to apply to any extensions not authorized? Would any prudent man have attempted to bind this company in regard to extensions, not authorized, contemplated, or even known about? What did they know as to the future operations of this company? And if it applied to any future extensions beyond what were then authorized, there is no limit. They can commence on the Sussex road at two miles and one foot

beyond the intersection at Waterloo, run a road across the continent to the Pacific, and compel us to take all their passengers and freight at this per centage, which they are seeking to compel us to pay, as by the terms of this contract.

Can it be probable, or even possible that such was the intention of this contract?

*Mr. McCarter*, for respondents.

The bill had two objects. 1. To compel the defendants to pay drawbacks under contract, and a decree for *future liability*. 2. As to alteration in guage of defendant's road. The second is not subject of appeal, and will not be considered here.

February 19th, 1851, the defendants were authorized to go to the Delaware, and to make contracts for transportation of passengers and freight to New York. They extended their road to Hoboken, and again to Phillipsburg, in 1867.

The suit is brought for per centage under the contract, over these extensions. Defendants interpose three objections.

1. Extensions not within the terms of the contract.

2. If broad enough to contain in its terms these extensions, there was nothing for them to apply to.

3. This contract illegal.

The remarks will be addressed first to the *construction* of this contract, and not whether the companies had the power to make it. Does contract bind defendants if they have the power?

It is perfectly clear it seems to me that the "further extensions" of the road include those not authorized as well as those then authorized. So far as the extension to Phillipsburg is concerned, it is recited in the preamble as being *at that time in the course of construction*. This can hardly, by any fair or natural construction of words, be taken to be a *future* extension. On this point see *Eastern Counties R. Co.*, v. *Hawkes*, 5 *H. L. Cas.* 348; *Lancashire and Yorkshire R. Co.* v. *East Lancashire R. Co.*, *Ibid.* 792; *Willink* v. *Morris Canal Co.*,

3 *Green's C. R.* 398; *Seymour* v. *Canandaigua and Niagara Falls R. Co.*, 25 *Barb.* 284; *Bishop* v. *North*, 11 *Mees. & W.* 418; *Garton* v. *Bristol and Exeter R. Co.*, 4 *Hurlst. & N.* 831.

What may railway companies generally do? *Barry* v. *Merchants Exchange Co.*, 1 *Sandf. C. R.*, 280. Within the scope of their incorporation they can do everything. *Angell & Ames* 271. Railroads may, under the decisions of the Supreme Court of this state, make contracts to deliver goods at places far beyond the limits of their lines.

Corporations may make perpetual contracts within the limits of their charter, to continue so long as charter continues. *Great Northern R. Co.* v. *Manchester R. Co.*, 10 *Eng. L. & Eq.* 11; *Yorkshire* v. *Great Northern R. Co.*, 9 *Exch.* 55, 642; *S. C.*, 25 *Eng. L. & Eq.* 482; *Columbus, Pequa and Indianapolis R. Co.*, v. *Indianapolis and Bellefontaine R. Co.*, 5 *McLean* 450.

It is clear, upon general principles, that this contract is not beyond the powers of this corporation.

But the opposite side say that the consideration of this contract was illegal.

This contract was mutual and reciprocal.

This contract does not bind the Sussex Company to build their road from Andover to Newton. Nothing is said in the contract which compels either company to build any further road at all. It merely recites what they were doing at the time of making the contract.

It is said that the Morris and Essex road are bound to pay for building the Sussex road. Why, if the Sussex road is never finished, the Morris and Essex road will never have to pay anything. Nor will anything be paid to the Sussex road, until said road is finished, and then only the per centage under this contract. It is also said this is paid out of the earnings of the Morris and Essex road. Why, they have their own earnings separate and entire. The Sussex road only has a per centage out of such receipts as are derived from the business brought by them to the Morris

and Essex road. The Morris and Essex desired and sought the ores from the mining region. Before this contract they were sent over the Morris canal.

Not a single case cited by counsel is analogous to the one before the court, nor do they show the contract to be illegal.

Upon the authority of a corporation to do what is not directly contemplated or authorized at time of taking the charter. See 5 *H. L. Cas.* 331, 345.

This contract is not *ultra vires.*

The counsel insisted that this contract is unequal, unconscionable, &c. But in their answer they only set up the illegality of this contract. They should not here argue that this question is unconscionable; if they intended to set up that, it should have been set up in the answer, then we could have taken proof upon it, and show that it is greatly in their interest.

*Mr. Frelinghuysen,* on same side.

The plea of *ultra vires* should not be recognized, although fully established, except when the public good requires it.

Corporations are not permitted to exercise powers not contained in their charter, when against the public good.

Railroad companies are not authorized, here, to deliver goods in St. Louis, but if they contract to do it, if goods are lost, they will be responsible.

Still less will the court recognize doctrine of *ultra vires,* when contract has run for sixteen years, and contracts have been based upon it. Still less, where not a stockholder, but the directors alone object; where they have actually acquiesced for sixteen years. 3 *C. E. Green* 194.

The court cannot set aside this contract, because the Morris and Essex road will retain the benefits.

The court will reject the plea of *ultra vires,* when it injures other parties. *Norwich* v. *Norfolk R. Co.,* 4 *Ellis & Bl.* 449.

The directors had the legal title, and were authorized to make any contract they pleased, and the stockholders, those

beneficially interested, have acquiesced. Now, how shall they object?

The defence in this case is unconscionable, and is not to be recognized by this court, unless required by public good.

There is no *ultra vires* about this contract. Freight and passengers were to be carried over both roads. This was mutual, reciprocal.

It is within their power to make contracts to deliver freight and passengers beyond the limits of their road. This principle applies, even when it is to be delivered beyond the limits of their own road. 2 *Com. Law* 758; *Amer. Law Reg.* (*August*, 1867,) 666; 27 *Maine* 573; 19 *Wend.* 329; 6 *Gray* 539; *Weed* v. *Panama Railroad*, 17 *N. Y. R.* 363; 2 *Kernan* 245.

It is indispensable to have this power. Express power is given to this very company, by their very charter, to enter into contracts for these very purposes.

The court has no right to enter upon the question of this contract, except on the ground of fraud or mistake.

From the nature of this contract, it must be perpetual. To object to it on account of its being perpetual, is to say that that which may be lawfully done, shall not be done.

It is said this contract is unconscionable. Why, intelligent, keen, sharp men have made a bargain, and they come into court and say the bargain is bad, and they wish the court to relieve them. Unconscionable! why, the Sussex road has never paid its stockholders; its stock has never been par, or anywhere near it.

But they were authorized, if contract bad, to consolidate the stock in five years. But no; the Morris and Essex road want the business without the expense. Of course, they would rather have the supplies over the Sussex road, without paying this per centage.

Counsel say this is a contribution of the earnings of the Morris and Essex road. If this is not so, there is nothing in their argument; it fails. Was it a contribution of earnings, or a drawback to tempt passengers?

Is this contract valid and binding as to these extensions? They are certainly included in the words of the contract. 4 *Hurlst. & N.* 33.

Where the words are clear, the understanding of the parties is to be taken from the words. 18 *N. Y. R.* 363; 2 *Cowen* 153. Where the words are plain, the burden is on the party who would take himself out of their effect, to show they mean something else.

Now the contract covers the extension in words, and in contemplation of the parties.

Mortgage covers an extension not authorized at the time of giving the mortgage, but subsequently authorized. 25 *Barb.* 284; 5 *McLean* 450; 35 *Eng. L. and Eq.* 835; 14 *Penn. State R.*

*Mr. C. Parker*, for appellants, in reply.

These parties, being corporations, are creatures of the law, with certain prescribed powers, with others springing from necessary implication, but having no right to go beyond them.

What is the agreement between these companies? The Sussex road is to take its regular receipts for fares and to receive thirty per cent. of gross receipts of the Morris and Essex. What right has Sussex road to take them? These receipts are what is paid for transportation on another line. Does their charter authorize their deriving profit from it. Their charter says they shall not employ their means elsewhere than on their route, for any purpose not *clearly indicated.* And the general law of corporations is the same, statutory or common.

The Sussex road can have no right to receive earnings of the Morris and Essex road for its work, unless as a gift. Can it lawfully do that, without stockholders give? It cannot *earn* from the Morris and Essex, nor can the Morris and and Essex give. If it is beyond power of the Sussex road to *take* the earnings of the Morris and Essex, how can the Morris and Essex give?

This is not a mere partition of through fares. No one could impugn that. Each company charges, and each receives its own. This thirty per cent. is an additional monthly *bonus.*

Through fares are always less fares. Partition then, right and necessary. But here there are no through fares, in the ordinary sense. There is something said of monthly settlements; but the payment of thirty per cent. is the settlement.

If there was no *seal,* and the parties could be bound without, would there be any obligation as to this clause in regard to payment ?

If Morris and Essex road is receiving the Sussex fares, there is yet *no partition.* So, why this payment ? Agreement is silent. We have to search to discover. It is not expressed.

The Sussex road may back out, if Morris and Essex don't go on with the extensions. It won't transport property till it sees Morris and Essex in earnest. Then, consolidation.

It is simply a plan to get the Newton road built, and then incorporate it with the Morris and Essex. This was confessedly unlawful, for the legislature had to be applied to.

The use of the funds is for building this road. Not able to give a bonus out and out, with which to build the road, its directors not ready to subscribe, the Morris and Essex says, drive on, finish in two years, you shall have thirty per cent., and we will consolidate, swallow you whole.

There are two reasons of illegality : 1. Legislative aid necessary. 2. Stockholders' assent.

The whole scheme is illegal, for, taken as a whole, it was the acquisition of a new branch, without authority of the legislature or consent of stockholders.

Taken more narrowly, it is the assignment away of stockholders' profits in the Morris and Essex on the speculation.

Taken as stated, it had no consideration, though it had a motive. That motive was to build a new road and so increase Morris and Essex revenues. Doubtless.

Whether the bargain be unconscionable, or the contract

*ultra vires*, it is a fraud on the stockholders, and so should not be enforced. It was a fraud on stockholders in the beginning, for it was seeking a new investment without their consent. It is a fraud ever since, for it yearly takes their profits and gives them to another company, operating now as a constantly increasing weight.

And now, if the decree of the Chancellor be affirmed, it will be in the way of every projected enterprise, for as fast as new branches are made they are to be subject, and all the profits on the Sussex transportation handed over.

Mr. Parker cited and reviewed the following cases : *Shrewsbury and B. R. Co.* v. *London and N. W. R. Co.,* 4 *DeG., M. & G.* 115, 21 *Eng. Law and Eq.* 319; 6 *Ho. Lds. Cas.* 114; 2 *McN. & G.* 325, 343; 11 *C. B.* 775; 10 *Beav.* 1; 9 *Exch.* 642; 22 *New York R.* 494; 21 *Howard.* 441; 5 *Ho. Lds. Cas.* 348; *Ibid.* 792; 25 *Barb.* 284.

The opinion of the court was delivered by

BEDLE, J.

This appeal raises the question of the right of the Sussex Railroad Company, under this contract, to compel the Morris and Essex Railroad Company to account for thirty per cent. of the gross amount of receipts for the transportation of passengers, and twenty-five per. cent. of the gross amount of receipts for the transportation of freight, over the extension of the Morris and Essex Railroad from Newark to Hoboken, on the one end, and from Hackettstown to Phillipsburg on the other, (in addition to a like per cent. for passengers and freight on the rest of the road from Newark to Hackettstown). This contract bears date July 24th, 1852; at that time these extensions were not built, or authorized by the legislature to be built. The extension from Hackettstown to Phillipsburg was mostly completed and in use by about December 1st, 1865. The authority to build that was granted by the supplements; one dated March 6th, 1855, the other March 13th, 1861. The extension from Newark to Hoboken was first

authorized by a supplement dated March 6th, 1857, and was subsequently acquired by a purchase in the year 1863, ratified by a supplement, dated April 12th, 1864, the particulars of which purchase will be found in that supplement.   It will thus be seen that the authority for each of these extensions has been acquired since the date of the contract.   The difficulty in question arises under the first section of the contract.   That relates to all freight and passengers which shall be transported over either of the roads of the said companies, *or any future extensions or branches of the same.*

First.  Do these words, " any future extensions or branches of the same," include the extensions in question ?   This is a matter of construction, and application of words to their subject matter.   In determining it, we must necessarily look to the situation of the parties and their powers.   The parties are creatures of the statute, and if these words can be fully satisfied by the objects authorized in their charters and supplements, we would not be justified in giving them an application to objects outside, uncertain, and unauthorized.   Corporations in dealing with each other are presumed to contract within the powers and limitations of their charter, and any intention to contract upon matters not then authorized, even with the expectation of a subsequent legislative ratification, must be clearly expressed.   There is nothing in this contract, certainly by express words, to show that the parties contemplated at any future time the construction of any lines not then authorized.   Such an implication is, however, sought from the general words, *any future extensions or branches,* but that could not be permitted unless it was necessary to look beyond the scope of existing powers to satisfy the words.   By the preamble of the contract it appears that the immediate purpose of the Morris and Essex company was to extend their road from Dover to Hackettstown, (it having previously been built between Newark and Dover,) and the immediate purpose of the Sussex company was to re-construct their road between Waterloo and Andover to connect it with the Morris and Essex road, and also to ex-

3 A*

tend it from Andover to Newton. These objects were within the immediate contemplation of the parties, the contract undoubtedly covers them, and each company had full power to accomplish them. The Sussex road was not then extended from Andover to Newton, and the Morris and Essex was in course of extension from Dover to Hackettstown. Besides these powers, each company had at the date of the contract, legislative authority to build other extensions and branches. And first as to the Morris and Essex.

That company was incorporated January 29th, 1835, with authority to build a railroad or lateral roads, from one or more suitable place or places in Morristown, to intersect one or more suitable place or places in the New Jersey Railroad, at Elizabethtown or Newark. By a supplement, March 2d, 1836, they were further authorized to construct a lateral or branch railroad from Whippany, in Morris county, to intersect the main line of their railroad at any convenient point at or near Madison or Chatham, passing through or near the village of Hanover or Columbia, or both, or by such other route as said company may deem expedient; and also to construct a branch or lateral railroad or railroads from some suitable point of their main road to the iron works upon Rockaway river, at or near Boonton or Powerville; and also to construct said lateral or branch railroads from Denville, Rockaway, and Dover, or from any of those places, so as to connect them with the Morris and Essex railroad at some convenient point or points. *Laws*, 1836, *p.* 223, § 2. By a supplement, February 25th, 1846, it was provided in effect that the time for the construction of those branch or lateral roads should not be limited by the time limited in the original charter, and therefore, the company were at liberty to construct those branch or lateral roads at any time during the existence of their charter, unless otherwise afterwards limited by the legislature. By this latter supplement the company were further authorized, when a branch or lateral road to Dover should be completed, to continue the same to Stanhope. By a further supplement, February 19th,

1851, (the year before this contract) they were empowered to extend their road from some point at or near Dover, to any point on the Delaware river, at or near the town of Belvidere, or the Water Gap, or between those places, and in case the same should not terminate at the town of Belvidere, to construct a branch railroad from the main line to Belvidere; and were also empowered to build a bridge across the Delaware with the consent of the state of Pennsylvania. This was the full extent of the power of the Morris and Essex Company at the date of the contract, to construct extensions and branches. Under the original act their road had then been constructed from Newark to Morristown, and under the subsequent power to build branches, had been continued to Dover, and when the contract was made the work from Dover to Hackettstown was being prosecuted under the authority of the supplement of 1846, to continue the Dover branch to Stanhope, and also, by authority of the supplement of 1851, to extend the road from at or near Dover, to the Delaware at or near Belvidere or the Water Gap, or between. As already stated, judging from the contract, the immediate object of the Morris and Essex at the time of its execution, was to extend their road to Hackettstown. With the road constructed to that place, the unexhausted powers of the company were yet to extend from Hackettstown to the Delaware at or near Belvidere, or the Water Gap, or between, and in case the road did not terminate at Belvidere, to construct a branch from the main line to that town, and also to construct the Whippany and Boonton branches. These powers certainly yet existed without reference to any others that might be claimed. Here then were sufficient subject matters within the charter and supplements of the Morris and Essex to fully meet the scope of the words, *future extensions or branches,* so far as that company is concerned.

Now next as to the Sussex Railroad Company. That company was incorporated March 9th, 1848, by the name of the Sussex Mine Railroad Company, (this name was after-

wards changed to the Sussex Railroad Company); they were empowered to construct a railroad from the Andover mines, in the county of Sussex, to some convenient and accessible point on the Morris Canal, in said county, with the privilege of extending it to the village of Newton, in the county of Sussex, and of constructing such *spurs or lateral roads*, not exceeding each five- miles in length, as may be necessary to afford access to the adjacent mines in the said county. Their charter was to be void if the road was not completed and in use from the Andover mines to the Morris canal within seven years from July 4th, 1848. The road was constructed between those points within the time limited. It was at first constructed with flat rails, and designed chiefly for the transportation of ore, but was afterwards reconstructed for passengers and freight, as contemplated in the contract. By a supplement, March 18th, 1851, the Sussex Mine Company were further authorized to extend their road to connect at points to be selected by them, in the counties of Sussex, Warren, and Morris, with the Morris and Essex, and Sussex and Warren Railroads, or either of them, and to connect the track or tracks of the said Sussex Mine Railroad with the said railroad or railroads. This supplement authorized an extension to connect with the Morris and Essex road, and also with the Sussex and Warren Railroad. The Sussex and Warren Railroad was incorporated February 21st, 1851, the same session of the passage of the supplement. The act is a public act, and we take judicial notice of it, although not referred to in the pleadings. That company was empowered to construct a railway commencing at a point in the division line between the states of New York and New Jersey, through the county of Sussex, within three quarters of a mile of the court-house at Newton, and through the county of Warren to the Delaware river, at or near the Water Gap; also to build a bridge across the Delaware, with the consent of Pennsylvania, and to connect with any railroad chartered or to be chartered in the state of New York or Pennsylvania. At the time of the contract, the Sussex

Railroad Company had only constructed their road from Andover mines to the Morris canal. That company then had power to extend their road from Andover to Newton, and also to extend it to connect with the Sussex and Warren Railroad (besides to extend it to connect with the Morris and Essex) and also to build as many spurs or lateral roads not exceeding each five miles in length as may be necessary to afford access to the adjacent mines in Sussex county. These were important powers, and they fully meet the requirement of the words, "future extensions or branches," so far as they may relate to the Sussex company, even if the extension from Andover to Newton is excluded. It is thus apparent that at the date of the contract these corporations each had powers unexhausted, sufficient to meet the requirement of the words in question, and such was the case even excluding the immediate extensions referred to in the preamble. Now, if we apply Lord Bacon's maxim, that "all words, whether they be in deeds or otherwise, if they be general, and not express and precise, shall be restrained unto the fitness of the matter and the person;" *Bac. Max. Reg.* 10; *Broom's Max.* 576; *W. L. R. Co.* v. *L. and N. W. R. Co.,* 11 *C. B.* 355; we must give an application to those words consistent with the objects authorized when the contract was made. And besides, it cannot be held with any reason, that when general words used in a contract by a corporation can be applied consistently with the scope of its act of incorporation, that simply because they are general they may be taken to refer to objects outside of it, even where, by their general application, they might include them. The conclusion to my mind is irresistible, from the considerations already stated, that these extensions, unauthorized at the time of the contract, were not intended to be included in it.

But let us look a little further and see the result of a different construction. This contract was made by the directors, but it is unnecessary now to draw any distinction between the powers of the directors to bind the corporation to

third persons, and the powers of the corporation itself. A very serious question arises as to the power of the directors to make such a contract, even if within the scope of corporate powers; but however that may be, their acts must certainly be restrained within the limits of the charter, and they cannot do what the corporation itself may be unable to do. An act concerning corporations, section three, passed in 1846, gives us an imperative rule of construction concerning corporate powers. It provides that, in addition to the powers enumerated in the first section of the act, (which are the ordinary powers of all corporations,) " and to those expressly given in its charter, or in the act under which it is or shall be incorporated, no corporation shall possess or exercise any corporate powers except such as shall be necessary to the exercise of the powers so enumerated and given." The Morris and Essex charter was granted subject to alteration, and its powers must, therefore, be controlled by that statute. The common law rule limits corporations to such powers as are given by the charter, or necessarily implied for carrying into effect the objects and powers expressly sanctioned. *Norwich* v. *Norfolk Railway*, 4 *El. &. Bl.* 444 and note; *Coleman* v. *E. C. R. Co.*, 10 *Beav.* 1; *Cam. and Amboy R. Co.* v. *Briggs*, 2 *Zab.* 623.

To that extent, at least, our statute is declaratory of that rule; but beyond that, the language is clear, that the legislature intended to interdict, as a matter of public policy, the exercise of any powers except such as are referred to in that third section. Whether without that section the common law would fully reach up to that measure upon any implication that powers not so granted or implied are prohibited, need not now be determined. It is sufficient that the terms of this enactment are plain and its meaning cannot be misunderstood, and that when a corporation exercises powers outside of those permitted by that section, its action is obnoxious to the charge that there is not only a want of authority, but that it is against an express enactment. The construction of corporate powers should, undoubtedly, be

reasonable, and so as to accomplish and not to defeat the purpose and true intent of the charter, in its full spirit and scope.

This is a liberal rule, but even that would not allow an implication of power in the Morris and Essex at the time of the contract, to stipulate that another company should have an interest in the freight and travel on roads or branches then unauthorized, or, taking a milder view of the contract, that the rates for freight and passengers thereon should be fixed that another company should be charged or allowed a per cent. or drawbacks thereon, even if such other company could make a contract of that character. The Morris and Essex could contract for freight and passengers over the roads then authorized. It also had special powers to enter into contracts with any other corporation or individuals for conveying passengers and freight between any point or points on the line of their road and the city of New York, and such a contract was in existence with the New Jersey Railroad Company when this contract was made, and part of this contract is in reference to that. To the full extent of these powers this contract could be made, and was to that extent within their scope, (that is, apart from any question of illegality, or want of consideration, or unconscionability, or want of authority of the directors to make it, against the stockholders); and all contracts bearing upon the traffic of the road *as authorized* that the exigencies of the business contemplated and authorized would reasonably require, would be within the scope of the company's powers; but a contract like this claimed, even in its least objectionable aspect, concerning rates of freight and fare upon extensions unauthorized, cannot be within the necessary scope of any implied power of this corporation. The corporation had no right, at the date of the contract, to build the extensions. No franchise to that effect had been granted; whether to be granted or not, was entirely at the option of the legislature. The whole subject, the enlargement of the franchise and the rates for freight and passengers, was within the control of

the legislature; and if the company should be afterwards empowered to build, it is questionable, at least, whether, without the consent or acquiescence of the stockholders, such power could be exercised. *Zabriskie* v. *Hack. and N. Y. R. Co.*, 3 *C. E. Green* 179. The power to contract upon such an uncertain subject matter ought not to be implied from any other objects authorized or the powers given to carry them out. This question is not analogous to that where railroads or other corporations agree upon a division of the tolls, or fares, or freights upon authorized lines. That can be justified from the power that each has to contract concerning its own authorized business, and such arrangements are not, to my mind, *ultra vires* the corporation. Neither is it analogous to cases where one corporation may offer inducements to another or to individuals, by a reduction in rates, in order to secure freight and travel over its road authorized. I see no objection to such arrangements; provided they are not unconscionable, for they are also in relation to the business of its own road. There are many reasons not now useful to mention, why, in justice to the state, the public, and the stockholders, and the very stability of the corporate body, the legislature should be jealous of its grants of franchise, and seek to confine them within definite limits, and to disallow any corporate act outside of them. The legislature has a policy in this matter. It is clearly declared; and that third section must be taken as a prohibition of any acts not within the scope of the powers permitted. Contracts in contravention of it are against the declared policy of the state, and must be held to be illegal and of no binding obligation. Analogies in support of this principle may be found in the following cases: *Ins. Co.* v. *McKelway*, 1 *Beas.* 133; *Pearce* v. *M. and I. R. Co.*, 21 *Howard* 442; 3 *McLean* 103; 5 *Ibid.* 194; 8 *Gill & Johnson* 318; 23 *Conn.* 511; 22 *New York* 281, (SELDEN, J.); *E. A. R. Co.* v. *E. C. R. Co.*, 11 *C. B.* 775; *McGregor* v. *Railway Co.*, 18 *Ad. & Ellis* (*N. S.*) 618; *Gage* v. *N. M. R. Co. Ibid.* 457; *Taylor* v. *C. and M. R. Co.*, 2 *Law Rep. Ex.* 357; *S. and B. R. Co.* v. *L. and N. W. R. Co.*, 6 *Ho. Lords Cas.* 113.

And there is no difference in this respect between law and equity, for the prohibition is against exercising the power. In equity, a covenant to charge an estate afterwards to be acquired, or in expectancy, may be enforced when the same has been acquired. 3 *Lead. Cas. in Eq.* 653; *Smithurst* v. *Edmunds,* 1 *McCarter* 469. But if it is against public policy to make the covenant, equity will not enforce it merely upon the ground that the party has become able to perform it. There is no difficulty in enforcing the equitable contracts of individuals concerning future estates, for there is no restriction upon their power to make them, but contracts resting on powers legal or equitable, if outside the scope of a corporation, are under the ban of the law, and cannot be enforced upon their own strength and the fact of a subsequent ability to perform them. In the case of *Willink* v. *The Morris Canal and Banking Company,* 3 *Green's C. R.* 377, although lands for the canal from Newark to Jersey City not acquired at the date of the mortgage, were held to be subject to it, yet the mortgage by description was held to include the canal, and the company clearly had the power under its charter to make such a mortgage. In England, the question seems unsettled as to the extent that the promoters of a railway company may bind the corporation when created, upon contracts in contemplation of the incorporation; but equity has decreed the performance of certain classes of contracts of the promoters, particularly for the purchase of land, when such contracts were within the scope and powers of the act of Parliament when obtained, or that and the general railway acts; and that doctrine was referred to in the argument in support of the legality of this contract as to these extensions. The contracts of promoters are not analogous to this. Railway enterprises in England are instituted differently from this country. There the promoters associate under provisional deeds, and these serve as a basis of operation until a charter is obtained. *Redfield on Railways* 5. They are a preliminary association of individuals whose acts are unrestricted, save only by their provisional deeds. They

organize in reference to an incorporation, and the act of Parliament is based upon their application for a regularly defined line. They may buy land for the purpose of the road in contemplation of the act of incorporation, and even the vote of a member of parliament under color of it, if he happens to be a landowner affected, but then there is no statute limiting the legality of their action, and they are not hampered by corporate restrictions. Now, whatever may be the true basis of the acts of courts of equity in holding the corporation bound upon such contracts, there is no question of public policy to prevent them from being enforced. But if a statute should limit the powers of promoters to contracts on certain subjects only, as for instance the purchase of land, and should prohibit the exercise of any other powers, I apprehend that a contract outside of the powers allowed would suffer the fate of all contracts against public policy, and not be enforced merely upon its own strength and the acquired ability of the corporation to perform it. The tendency of the more recent English cases is to confine the enforcement of promoters' contracts to such matters as are necessary in the carrying out the purposes of the charter, and as are within the scope of it when granted. *Taylor* v. *C. & M. R. Co.*, 2 *Law Rep. Ex.* 366; *Preston* v. *Railway*, 5 *Ho. Lords Cas.* 605; *C. & D. J. R. Co.* v. *H. H. Trustees*, 39 *Eng. L. & Eq.* 28. And this is a restriction upon what was once permitted, that is, to buy off opposition to the granting of the charter. *Petrie* v. *Eastern Counties R. Co.*, 1 *Railway Cases* 462; *Edwards* v. *G. J. R. Co.*, 1 *Myl. & Cr.* 650. That, in England, not being an illegal act, strange as it may seem to us.

For the reasons stated, the doctrine concerning promoters' contracts cannot properly be applied to corporations in this state. In analogy to the action of promoters, the corporation would be the promoter in this case, but it would be subject to the restrictions upon a corporation; and here it must be distinctly understood that it is not intended to intimate, in any way, that if the contract had been ratified by the legislature or by the corporation, as to the extension, after

the necessary powers to carry it out were acquired, and the road built, that, by virtue of such ratification, it might not be enforced. No expression of opinion is necessary upon that subject, as there is no legislative ratification, and no ratification by the corporation through its stockholders, or even the directors, for they have always refused to treat it as covering the extensions. The object of this bill is to enforce this contract as to the extensions, upon its own strength, and the fact that the company has acquired the ability to perform it; and the answer to that is, that as to the extensions, at least, the contract would be illegal.

The case of *Eastern Counties Railway Company* v. *Hawkes,* 5 *Ho. Lords Cas.* 331, was much relied on by the appellees' counsel. That company applied to Parliament to build a branch railway; plans and sections of the route were deposited in the usual way. The line would pass through Hawkes' land. He opposed the bill, and the company agreed to pay him a certain price for his land, and damages after the bill should pass, and he to withdraw his opposition to it. After the bill was passed, he brought suit for specific performance, and it was decreed. The Lord Chancellor treated it as a contract not binding till the bill received the royal assent, and then that the rights and powers of the company were to be regarded the same as if they had originally been powers to make the new line, and to apply the funds of the company to a purchase within the scope of their incorporation. Lord Brougham was of opinion that there was nothing illegal in the agreement. Lord Campbell treated it as a contract for the purchase of land, with a view to the parliamentary plan and buildings after the act was obtained, remarking that where there is no offence to be committed against the public, and there is a mere *want of authority* for a transaction among *private individuals or commercial companies,* which authority can only be obtained by act of Parliament, no objection can be successfully made to the parties entering into an agreement for completing the transaction, when the necessary authority is so obtained. That case, in

fact, is not analogous to this, as it was for the purchase of land necessary for the line, and expressly to be carried out in reference to the definite plan presented to Parliament. But, apart from that, it is quite evident that no difference was made between a want of authority on the part of an individual and a corporation, and that even the implied prohibition against a corporation exercising powers outside the scope of its incorporation, which I think is the common law, and which was so indicated by the same Lord Chancellor, afterwards, in the case of *Shrewsbury and Birmingham Railway Co.* v. *North Western Railway Co.*, 6 *Ho. Lords Cas.* 137, was lost sight of.  The facts of that case are not sufficiently akin to the one before us, as to necessarily require us to dispute its doctrine, but the binding force of our statute, if we treat the corporation in the light of promoters, would prevent the application of the principle of that case to this.

Viewing the contract as illegal if extended beyond the roads or branches authorized when it was made, we are bound to so construe the words in question when they admit of a double intendment, as to give them a legal operation. 1 *Parsons on Contracts* 11, and note; *Chitty on Contracts* 733, and note.  That rule will restrain them and the operation of the contract so as to exclude the extensions afterwards authorized.

The suggestion that the extension or branch from Hackettstown to Phillipsburg may be treated as a substitute for the road to Belvidere or the Water Gap, and the extension from Newark to Hoboken, as a substitute for the mode of conveying freight and passengers on the New Jersey Railroad, is not warranted by the contract, even if no question of power interfered, for the contract was made in relation to exisiting lines and powers, and there is no provision in it to substitute any other lines for any part of them.  There is nothing in the instrument from which such an intention can be gathered.  The case of the *Midland R. Co.* v. *London and Northwestern R. Co.*, 2 *L. Rep. Eq. Cas.* 524, upon the

Morris and Essex Railroad Company *v.* Sussex Railroad Company.

construction of a railway contract, is quite analogous to this, on this point, and that case also has an important dictum of the Vice Chancellor against the validity of a contract for traffic, not very unlike this on a line subsequently authorized.

In the conclusion to which I have come, it is not necessary to give the word *roads* in the third section of the contract, a less restricted application than to the roads and extensions or branches mentioned in the first section.

It is very evident that the issue between these parties is in regard to the right of the Sussex Company to compel a performance by the Morris and Essex of the contract as to the extensions, and that no account is necessary to be ordered for drawbacks on the rest of the line. Any expression of opinion, therefore, upon the want or illegality of consideration in the contract, apart from the extensions, or the power of the directors to make it, or on the question of unconscionability, is reserved until these questions are directly before the court for determination. The decree should be reversed, and the bill dismissed, with costs.

The decree was reversed by the following vote:

*For reversal*—BEASLEY, C. J., BEDLE, CLEMENT, DEPUE, KENNEDY, WALES, WOODHULL.   7.

*For affirmance*—OGDEN, OLDEN.   2.